Receipt of Payment Mr. Pagrum, good morning Good morning your honors, I'm John Pagrum for Mars Incorporated. In this case we are here on the damages stage of a 18 year old case in which the district court denied lost profits to Mars which is the subject of Mars appeal and awarded a 7% reasonable royalty for the longtime infringement of two Mars patents that are now expired by COINCO coin acceptors abbreviation COINCO and that is the subject of COINCO's appeal. Mr. Pagrum you've been around the patent a little longer than I have but I went all the way back to 1982 looking for a case in which a patentee was awarded lost profits when it had no capacity to produce goods that might have been sold but for the infringement. There's one case where I think 40% was the patentee they subcontracted the rest but do you have a case in which a patentee has ever recovered lost profits where the patentee was not self making the goods? I can't think off the top of my head your honor of a case however I would and so this would be the first such case. Well I would put it to you yes or no I suppose it would. I suppose there is evidence in the record is that Mars did not make use the product right? That is correct. So if Mars gets lost profits we will have created brand new law. I don't think you're creating brand new law for two reasons your honor. If there's never been a case that supports your proposition I believe you're making new law are you not? Well I think there's an analogous case I don't remember the name of the case off the top of my head I can look in the brief and find it for you. There is case that you need to be shy about answering that question. Yeah well I'm just trying to be honest and direct to Judge Clevenger's question. I don't have any reluctance in asking you to create new law because my first point is a wholly owned subsidiary ought to be treated as though it were it collapsed the fiction right? You collapse the corporate structure? My argument is that you ought to look at the facts of the particular situation and that well there's no evidence in the record here that the profits were upstream. Yes there there was both a declaration that is to that effect from Mr. Cornell I believe there may have been some deposition testimony. There was a finding in one of the court's orders that there was no evidence of actual enjoyment of it. The court refers to well it's citing what COINCO says but it does say that Mr. Cornell did not say the profits flow and it talks about Mr. Cornell's deposition testimony where he said MEI pays dividends to Mars occasionally. Well the issue of dividends in that case was because of the way it was managed the profitability was such that it did not show up as dividends that would be payable. On your theory a subsidiary that was 51% owned by Mars might also qualify. No well I don't I don't I'm sorry I've not really addressed that but my theory is that where you have a wholly owned subsidiary one way or another sooner or later everything goes to the parent nobody else has a claim on it. Assuming that the company has made an election for consolidated financial statements. Yes. Which so if you have a wholly owned subsidiary where an election has been made for consolidated financial statements my understanding is that simply by virtue of that arrangement all of the profits of the two corporate entities are consolidated and reflected on that one statement that shows profits or losses of the parent. I believe that's correct your honor. So you're as I understand your theory then under those limited circumstances in a two supplier market satisfying a but-for test that the losses of the subsidiary are the losses of the parent simply by virtue of the the the arrangement of a wholly owned subsidiary and a consolidated financial statement. That's correct your honor and Mr. Cornell at AP 2162 in paragraph 11 said all profits and losses of MEI Inc. directly affect Mars Inc. and are recognized by Mars Inc. through dividends and royalty payments by MEI contributions to MEI Inc.'s capital loans to MEI Inc. and valuation of the assets of MEI Inc. But if indeed your theory is valid that in effect all the profits or losses of the subsidiary are reflected in the consolidated balance sheet and there are therefore profits or What role, what function does a royalty arrangement or a dividend reporting arrangement play? This goes into the the question which also occurred with the UK and there was in this case on the royalty reasonable royalty side there's been some discussion of it. It's taxed differently in some situations if there are different countries involved and so that the precedent in terms of the the UK component the the sister subsidiary and the pattern which they chose for some tax related reasons was that they had to negotiate with the UK There were royalties and dividends from MEI. I don't know why they they did the same plan with both and Mr. Cornell I believe testified that this was all In the UK the royalties would have been deductible and the dividends they would have had to pay taxes on and so the negotiation with the UK over what was an appropriate balance with respect to that company for whatever reason Mars decided to do the same plan for these two companies which were commonly managed the MEI UK and the MEI US had a common management they ran the businesses but MEI UK had the European business and MEI US had the US related business. But under the arrangement where they've elected a consolidated financial statement it does seem a little odd and and of no real consequence to have some dividend agreement or some royalty agreement it's all one big happy financial family. I I don't know the you know I'm not a tax attorney and I'm certainly not Mars's tax attorney I'm sure they have excellent ones and that they had good reasons for why they made this arrangement. Well but if there are tax consequences and that's why I'm sort of pressing the issue if if there are consequences then it's not necessarily reasonable for us to conclude that for purposes of patent damages lost profits of the sub or the lost profits of the question isn't whether you pay sooner or later but rather when do you pay? Well you know the short of the matter is that there were reasons why the corporate structure was set up the way it is and and you would like to collapse MEI into Mars for purposes of winning lost profits but at the same time the corporate structure wants to keep them separate for other reasons. Well I think that's true. I think that's true but I don't think that those reasons. That would be to say that we'll because this is patent law we'll have a special rule that you'll be allowed and the Supreme Court wouldn't like us to do that but we'll have a rule that says for patent law lost profits purposes we will disregard the carefully structured corporate structure for which reason exists for it to exist that way. Well I think there are two reasons that you should come to my conclusion and that is first of all in the DEVEX case the Supreme Court. Part of my trouble is that the law has been established like forever and the law also is true that a non-exclusive licensee doesn't have standing. So Mars presumably with skilled legal counsel knew that if Mars whoever wanted to sue for the lost profits ought to be the party who's making the stuff and the party who's making the stuff ought to be something other than a non-exclusive licensee. So it's not hard for Mars to have positioned itself to allow whoever wanted to sue for lost profits to be the person to do it. Well we rely on the on the case law that indicates that a patent owner can rely on somebody else by contract for example to actually manufacture the product. Well the only case law that allows you to do that is the case law in which the patentee himself was making 40% of the good. That's why I asked you originally there's no case in which a non-performing if you will patentee has ever won lost profits. Well I don't see the legal distinction your honor between the case where they had had somebody else make 60% and the case that we have here. You didn't Mars didn't make 40% did it? No of course not because Mars was a holding company it didn't make anything in this technology. So the can I go just go back to the original point I'm a little confused the profits and losses of MEI affected Mars because they were they were recognized by Mars only with respect to dividends and royalties and contributions capital whatever. I mean it was the dividend royalty thing that's critical right? Well no that's the fight that's the relationship that's how well I would go one step further than that and indeed Mr. Cornell did in the part of his declaration that I cited and that is the asset value of the company. Okay so let me go on what Judge Clevenger initially started to ask you hypothetically about what if they own 51% so how would this be different if we reach the rule that you would like us to reach in this case then if Mars 2 comes in and they own 51% of MEI and the pass-through of profits and losses was through dividends and royalties why wouldn't we have to reach the same conclusion in that case with respect to 51% of lost profits? Well I think it's a I think it's a very different situation in the in the 51% example that you give because Mars and MEI was present in court all the way through this case as a party and a participant in the discovery they were. So the 51% sub would have been too so we can adjust the facts so that they're the same. Well I do think that it is I said at the beginning that it is fact-driven and I would point out that in. If we go your way and then we we can be confident of having to go along this slope whether it's slippery or not in the future. Yeah what I would say you have a situation where your sub was only 51% on you'll be in here arguing well come on lost profits for the parent of the consolidated group. What I would suggest to you is that even in the polyamerica case they sent it back to the district court this court sent it back to the district court for the determination of what the actual losses were. I just made the point because anytime that we're being asked to new law it always seems to me prudent for the court to ask itself a few questions like is there a slope and is it slippery where is it going. Can I ask a question on another point sir? Yes sir. In the appendix at AP 3177 we have the COINCO confirmation agreement. You're familiar with that document I'm sure. Yes. Is there any other document in the record other than the COINCO confirmation agreement that deals with the subject of transferring title from Mars in 2006? No but there is one other fact that is related. I just saw that the answer to that is no. That's correct. So is there any evidence there is no evidence in that does the COINCO confirmation agreement transfer title? That's a yes or no answer to. The confirmation agreement does not transfer title but there's a reason and the reason is that the recorded title always remained with Mars. They never went down to the patent office and recorded a transfer of the title. But is there a difference between recorded title and title? There's a question that I understand Judge Clevenger is asking is whether there was an assignment of the actual title independent of any recordation. Okay there was no assignment in our view either way of the I'm trying to be very clear about what we know that I mean the record shows and everybody seemed to think that Mars transferred title to MEI in 1996. I continue to disagree with that. That's what the court said. Well they said that a legal ownership or something to that effect was transferred but in any event yes they said the court said what it said. Let's just assume for purposes of it were so that the title was assigned to this patent to MEI in 1996 by Mars. Assume that as a data point. Yes. Then we do not have any evidence in the record do we of a reassignment of that ownership back to Mars in 2006. Correct because the patent had expired and there was no title in our view to assign back. If this document was a right to sue for under the expired patent you could go back and sue six years? Yes and that was assigned by MEI back to Mars. You receive that right because you have title. It may be title to a defunct patent but it is your right to sue right? No. Well this is your other side without the so-called title without the assignment title you have no standing. Well our position is that Mars had the recorded title all along. Did your brief say that? I don't believe it does. Does it or doesn't it? I don't recall it your honor but that has been our position that it was that it was recorded in the patent office all along but the point was... But it was transferred to MEI in 96. I thought we had at least gotten that point right. I understand. Our position is that there was nothing that there was nothing there were no substantial rights to transfer back from MEI to Mars Incorporated in even though the patent had expired the coin code confirmation agreement could have simply said we're sending you for whatever it's worth we're reassigning you the rights under the patent. We're assigning you the patent and if you did that then the right to sue under it would flow as well. Do we have any cases in which I mean it's quite clear just the bald right to sue without anything else doesn't give you standing for a live patent to come in and sue under the live patent. Do we have any cases when a patent that we have where patent has expired and one you know I own the patent and after it expires I sell Judge Lynn nothing other than the right to sue. Do we have any cases where that clearly is sufficient for Judge Lynn now to have standing to go in and sue for past damages on an expired patent? I don't recall that your honor. I don't recall any such case. But you think the answer would be and should be what? Well I think the answer should be that because there were no other substantial rights that all substantial rights were transferred and that none of the problems that have been envisioned when you separate the right to sue for the past from the title would accrue. To the extent that it has not been corrected it could even be corrected now I think section 1653 of the Judiciary Act says defective allegations of jurisdiction may be amended upon terms in the trial or appellate court so it's not too late now even if there is something that needs to be cured and in fact that the Shriver case was a case that spoke to the to the curing of a defect in jurisdiction. Mr. Pegram you were you were intending to reserve ten minutes and we have actually used up all of your time plus three minutes but I will restore seven minutes for rebuttal and we'll extend seven minutes to Mr. Mallon's time. Let's hear from him. Thank you for your questions. Good morning. Good morning. If it pleases the court, Kenneth Mallon on behalf of Coining Sutures also known as Coinko. Coinko believes that the district court here erred with respect to its findings on the 7% royalty for several reasons. First, Mars admitted that in an arm's-length transaction a royalty with respect to its entire patent portfolio including the two patents at issue in this case in excess of 4% was just that too much money. Second, other licenses that Mars granted with respect to the two patents at issue never exceeded this amount and in fact declined over time. With respect to that 4% figure, that was the result of discussions connected with the tax matter in the UK. Yes it was, your honor. And that was with respect to payments if I'm not mistaken between MEI UK and MEI or MEI UK and Mars? The concern that was raised by the United States with the propriety of the amount of royalty that was being paid by the subsidiary to Mars Incorporated. So that's not necessarily, I mean between that being a sort of intra-company arrangement and a UK tax matter, what relevance is that to an arm's-length hypothetical negotiation in the United States between a patentee and an adverse party? Significantly, your honor. First, under the appropriate statute 28AA in the United Kingdom, the new royalty agreement that was put in place had to be at arm's-length. In other words, the United Kingdom Taxing Authority would not have agreed to the new rate unless it in fact included an arm's-length transaction just like Mars Inc. had entered into a negotiation. The point was that could be an arm's-length transaction but it was driven by a demand by the Inland Revenue to make certain that that number wasn't bigger than 4%. Because Inland Revenue looked at it like what it would do is draining income out of the UK and into the United States adverse to the interest of the Queen. Well that may well be true but Mars... I think what the presiding judge's question was, well in those circumstances doesn't that suggest to you that the 4% isn't necessarily solid proof of what in a free market in the United States or without these British tax consequences what the parties might have agreed to? Well in that particular case under the licensing agreement, Mars and MEI both agreed, admitted that a royalty rate in excess of 4% was excessive. And the license agreement, your honor, that was granted was a license to MEI across the country which included the ability then for MEI to in fact use these patents in the United States. Correct me if I'm wrong, sir. My recollection of the judge's opinion on this subject was that the 11% figure from somewhere, was it 11%? He thought he was sort of forcing you down to 7. I believe that's true. Where did the 11% come from? The 11% number was a product of the expert that Mars put forward on the question of royalty. And it was a blended rate reflecting the number that he had chose for the 137 and the 7% figure he had chosen for the 719. So are you arguing that that 11% figure is so wildly erroneous, should be not considered? I mean it's in evidence, right? It is in evidence but the expert, Mars' expert, based his testimony on that rate without any consideration whatsoever of the non-infringing alternate is what were available to Coincode. In fact he admitted at trial, I didn't even know they were there. Does the horsing from 11 down to 7 reflect that the judge is taking that issue into consideration? I don't think so, your honor. And the reason is because with respect to the 719 patent, which ran in the period of time from 1992 to 2003, that was the only patent alive during that time. The only number that was suggested by Mars' financial expert was 7% for that patent. In other words, there was no horsing down, if you will, by the district court with respect to that number, even though Mars' expert recognized, look, I didn't even know... Where did the 7 come from? I'm sorry? Where did the 7 come from? The 7% number came from Mars' expert too. He just said, based upon what I've seen, it should be a 7% number with respect to the 719 patent in a situation where Mars wasn't even practicing the claim of that particular patent. And keep in mind with respect to that 719 patent, it had been offered to COINCO approximately two months or three months before this hypothetical negotiation for $50,000. Mars bought it for $200,000 and the district court found that three months later at the time of the hypothetical negotiation that COINCO would have agreed to and Mars would have sold a non-exclusive license for $10.7 million, a 5,000% return on investment in three months. In a situation where COINCO could have returned to its non-exclusive, I'm sorry, non-infringing alternatives that Mars admitted was available, acceptable to its customers for only $2 million. That's where the mistake was made based upon an expert testimony who didn't even know about the existence of the stipulation by Mars. But it seemed to me that Judge Liflin didn't take into account all these various factors, did he not? I'm sure that he took into account these factors, but the problem that he had was the inconsistency within his opinion. With respect to what happened at trial, evidence of non-infringing alternatives was brought forward both fact witnesses and expert witnesses by COINCO. Mars chose never to refute any of that at the trial court and did not seek to appeal any of those findings when it comes up to the appellate court here. So for purposes of this hypothetical negotiation, what the court was aware of was that COINCO had the desire to in fact go ahead and turn to one of the non-infringing alternatives rather than paying a high royalty to Mars. With respect to the 137, the evidence, the uncontroverted evidence was it was $146,000 for COINCO to have turned to a non-infringing alternative. Mars didn't refute that. With respect to the 719, COINCO could have turned to a non-infringing alternative for $2.2 either. And so we believe it was against a substantial weight of evidence. It was a clear mistake by the district court here to have awarded the royalty that he chose. It's just exorbitant with respect to what the non-infringing alternatives were. I don't want to take you away from your main argument on the rally, but I would like to ask a question on the cross-appeal on the standing, if you don't mind. You heard us in our colloquy with Mr. Pegram talking about whether the events of 2006 were sufficient to obliterate the effect of the events in 1996 for purposes of giving Mars standing to sue for damages in the post-96 period. Why is it necessary for Mars to get assigned in 2006 the ownership interest in the patent if the patent is expired? Because we believe under Crown Die one must have both the title, whether the patent is expired or not, as well as the right to sue. In this particular case... But it's a title to a dead animal, but it's a title nonetheless. And unlike a car that may be sitting on a junkyard, it still has a title. It may not have any value, but in this particular case it's the key that unlocks the ability for Mars to come in and claim that it has a right to sue to recover infringement damages. So you disagree. You think hypothetically if you just convey after a patent is expired, if you sell someone the right to sue, you think that they would not have standing? Based on the Crown Die case, Your Honor, that's correct. You have to have all of those things in order for someone to be subject to competing suits. That's true, Your Honor. And how does that... That's not the case, is it, with respect to the hypothetical? Because if the patent has expired, no one else can come in other than the one who owns the right to sue. Well, that's the problem, Your Honor, that we had in this case. MEI was not a party to that action. MEI never had a liability finding entered in its favor. Right, I understand that. COINCO never had an ability to go out and correct what MEI may have done with this patent. So the questions always remain if MEI... But after the patent has expired, if someone comes in, I understand it's not this case, but in a hypothetical, after the patent has expired, the only one that can come forward is the person with the right to sue. I agree, Your Honor, but how many people are there out there who have a supposed right to sue? We don't know. Well, let's say you have an exclusive right to sue. You wouldn't get the right to sue if you'd been assigned the title? Well, you would, in my opinion, and the person against whom those damages were sought would then have a piece of paper to go to everyone else who might file suit instead. That's my point to Mr. Pegram, that this 2006 agreement simply could have said, you assigned us ownership of the patent in 1996, we hereby reassign it to you. And it was contrived from the beginning, Your Honor. Keep in mind what happened here. We moved for summary judgment based upon the fact that we did not believe that Mars Incorporated was entitled to lost profits. Some three and a half years later, we finally get a decision that says you're right, Coinco, and Mars, at that point in time, apparently has gone out now and has not only transferred its interest with respect to these patents to MEI, but at a later point in time then transfers these patents to a third party. So in order to try to fit itself within some sort of Shriver analysis, it comes back to the problem. Shriver shows up in medias res, so to speak. So all of a sudden Mars can say to itself, whoops, what we gave away in 96, we can now grab back. But the problem with the Shriver analysis is Shriver was not a final judgment. And in this particular case, there already was a final judgment with respect to the question of liability. So you go back to your basic law school. That's dicing it. I mean, that's the issue that we have to decide is whether what Shriver is a final judgment in the case in front of the district court as opposed to a final judgment on some issue. That's true, but I dice things because I'm a trial lawyer. You don't get to go to damages until you have a liability finding in your favor. There's a Supreme Court law that allows the cure after a summary judgment has been entered. But not if there's a situation where there's been a final judgment. Here there was a final judgment on liability. MEI, now through the shoes of Mars, is asking this court to proceed directly to damages without a liability finding in favor of MEI. Mars only can file a judgment on liability, but not necessarily a final judgment in the case. Oh, I agree. I mean, patent cases are a little bit unusual because of the ability under the statute to appeal the judgment, you know, even when there is an accounting unresolved. I agree. And that's true in other cases as well, Judge, where you have a situation where the case or the issue, if you will, has been certified up early. But the bottom line is MEI in this case has never had a liability finding in its favor against COICO. But Mars wishes to proceed to collect MEI's damages without having that liability finding. But what harm would there be in extending the Shriver case to the facts of this case? Well, for one thing, Your Honor, the statute of limitations. MEI chose for 15 or 16 years to stand idle in this case. It may well have been a party, as Mars counsel suggests, but it was only a party for purposes of a declaratory judgment action. MEI never stood before this judge and said, Judge, I want to be a party for purposes of collecting infringement damages. So one of the issues that may have come up, if we ever got to the question of... But the statute of limitations would take you to what? From the expiration of the patent? Well, as I understand it, Your Honor, back six years. So we're talking about the difference between 96 and 97 as the starting point. That is one of the questions, yes. When does that window open? Right, but even if you open it in 06, the right to sue opened in 06, then you go back six years to 2000. Yes. Maybe from 2000 forward, but from 96 to 2000, they'd be out of luck. They'd be from 2000 to the patent died in 03. Exactly. And then you go through the same analysis. Are there non-infringing alternatives that were available to COINCO during that period? You're at least entitled to that if we rule against you on your theory of when Shriver bites. I would agree with that, Your Honor. But we don't think in this particular case... Is there a policy reason? I mean, you mentioned earlier the fact that you've never had a chance to stand and fight against MEI directly on the issue of liability. Yes. What I think the presiding judge was asking was if... We clearly understand here that we have a question of whether we're going to limit Shriver, if you will, which Shriver looks like a final judgment at the end of the case because J-Mal was coming to the last act. So is there a policy reason why we should say that isn't simply driven by the circumstances of this case that says to us that where there is a final judgment in a case, 54B, appeal and whatnot, then that's a lockdown. That issue's over. And Shriver, she should not be allowed the benefit of Shriver after that. I hadn't considered that question, Judge, but it seemed to me it gets back to the point that COINCO was making in its briefs, which is you can't proceed directly to damages. There's a reason why Shriver exists. There's a reason why there's a window available through Shriver for another party to come in and join, or in the court's words in that case, to cure the problem. But once that window is closed, in other words, there is a final judgment on liability, you're outside of Shriver. And the first rule of Shriver, which is, look, you have to have... Maybe you're outside and maybe not. I mean, there's some case law in the Supreme Court that suggests that the cure can come before the end of the case in the district court. Well, that may be true, but then you're going to have to go back and retry the question of liability because, again, you still do not get to go immediately to damages. The defenses that may be available on liability still have to be adjudicated. You're arguing the liability of whether your client is liable to MEI, but doesn't MEI disappear and go away once we get the title back? If we did, does Mars? No, because... Mars is suing on its own bond. No, Your Honor, that's not true because Mars, Inc. lost the title, fully assigned it on January 1, 1996. And so the court is going to have to look from January 1, 1996 until whatever day that MEI, in fact, returned. But doesn't Shriver's cure cure Mars? I don't believe so because during that period of time, the title holder, MEI, is a separate party against whom COINCO may have separate defenses with respect to MEI's claim for patent infringement. It'd be just like a case in which Judge Lynn was in a car accident, had a... Let me come back to my policy point. From a point of view of, if you're right, sir, that if we go this particular route, you end up with at least you get a trial where MEI has to come after you. So, in the interest of judicial economy, there weren't any judicial economy issues involving Shriver, as I understand it. There wasn't any suggestion that there was going to be a new trial. Well, I guess, unless the J-Mall had... Well, no, the J-Mall simply would have thrown the jury verdict out, the case would have been over. So, would you argue that in a circumstance like this one, where you're going to have to end up having a new trial, right, that it's really too late to allow the cure under Shriver to occur? I would. I would argue it's... Does that sound right? I mean, I'm not fishing for a rationale, but... And it's hard to explain, quite frankly, in policy terms, Your Honor, and that may be, as I understand it... You had to write the opinion, sir, if your task was ours. And you had to write the opinion in which you said, at least for purposes of this case, Shriver will be understood to say that once the final judgment on liability, that is to say, coin code to Mars, had been adjudicated, game's up. Mars can't cure for itself or MEI after that date. And the policy is, the reason is judicial accounting. MEI was standing there. They could have taken care of the problem much earlier, but... Would it also be the case if we didn't pick the liability being the end, we would have to reach the other extreme, which is case absolutely done at the district court. And that might include not just liability and damages, but attorney's fees at the end. I mean, couldn't we have a scenario where we'd have liability determined, damages determined, attorney's fees concluded down the year, two years later, and then Mars would still have the window of opportunity to undo all of that with the Shriver cure? Now, I don't understand your question, Your Honor. Maybe I'm confused by this point. To me, at least, it's a situation where either MEI, as a result of the incitement in January 1 of 1996, sues in its own right, or MEI assigns its title and its right to that cause of action back to Mars. Mars comes forward, not unlike a subrogated party, if you will, and says, I'm now asserting a claim on MEI's behalf. And COINCO gets to make whatever defenses it may have to MEI. COINCO is not making defenses to Mars. The COINCO Mars infringement case has already been done. It's already been considered. There's a liability finding there. But there's a question of whether or not there are defenses available to COINCO vis-a-vis MEI, which are separate and apart from that. And so, yes, Your Honor, if your question is- Such as defenses available? Well, the one that comes right to mind is the statute of limitations defense, such as what non-infringing alternatives may have been available in 2000 when the accounting period opens up that may not have been available back in 1986 or 1987. There are a number of things. Those are the two that, right off the top of my mind, come into play. But in this particular case, what we know for sure is that, in order to try to slip in under a contrived basis, what they did was come up with this COINCO confirmation agreement, which was actually written after whatever transaction documents moved all the patents from Mars and MEI to a third party. And even on its face, all it did was give just a straight right to sue, not the title to the patent, which is, I believe, inconsistent with the Crown Dye case. Well, isn't it just clearly nothing really much more than a ticket to the Shriver Party? It could be a ticket to the Shriver Party. But I think you're sitting in the back seat. You're not sitting in the front seat. And the back seat in this particular case I don't think is good enough, especially based upon the defenses I believe COINCO would have with respect to that case. Your Honor, we also, the underlying part of the appeal that COINCO filed was with respect to the amount of that damage award against the 7% figure. I see that I have two minutes left, which are consistent with what I had asked for earlier. But on a bottom line basis, we believe that it was simply egregious in this particular case for the district court when Mars chose not to refute the evidence about the non-infringing alternatives to have awarded Mars $4.7 million with respect to the 137 in a situation where for only $146,000 we could have simply turned to a non-infringing alternative. And it was similarly bad when the court decided to award $10.7 million on the 719 patent when we could have turned to the non-infringing alternative for $2.2 million. This is especially true based upon Mars' own internal documents on this issue in which Mars' own people said about these patents that they were of limited value, that the competitors were easily designing around them. And then based upon these documents for the court to have now gone ahead and accepted the testimony by the accounting expert for Mars saying that the 7% figure was appropriate when that accounting expert said, I didn't even know about the non-infringing alternatives. I didn't consider them. I didn't give any downward adjustment with respect to my testimony. And I didn't even know that Mars stipulated that the new $9,300 was available at all times during the 719 period by itself. Keep in mind that the new $9,300 based upon the stipulation reached with Mars was available from the first quarter of 1994 all the way through the conclusion of the 719 in 2003. The expert who said 7% was the appropriate figure didn't even know about that stipulation and admitted the same during his testimony. I take it that the parties were quite comfortable with the leisurely process of this lawsuit. The complaint was filed in 1990. It's 18 years. I guess, gather, no one was urging the good judge to speed it up? Well, your honor, I was involved for the case for the last four or five years. And I understand these kind of cases, the law firms love them, but the clients can't. Well, my client's sitting in the back and I'm sure he didn't enjoy writing those checks for 19 years. Judge Lynn, I believe, sat on a prior panel in which this case was talked about. The reality was it was a difficult case. I believe that both parties and the trial court took whatever steps it could to try to make the case go quicker. Clearly, the trial judge did take opportunities after the evidence was adduced to consider decisions. The parties moved with respect to those matters when it was appropriate for reconsideration and it took a long time. This particular trial on damages is only four days in length. The transcript was extremely short. Both parties did, I believe, an economical job of presenting the evidence. You are suggesting the possibility that there will need to be another trial. This is jar and dice against jar and dice by the time we're done with it. I don't think we need another trial here, Judge. Based upon the record in this case, there are not genuine issues of material fact that remain. I believe what's necessary is this court should remand the case. You're telling us that you don't believe Mars can have the benefit of Schreiber unless you have a bite of the apple with MAI. I believe they're not entitled to that bite of the apple. I'm just saying, let's assume you lose on that issue. And we're going back to the district court for another 18 years? No, I don't believe so, Judge. I believe the evidence is in the record. And I believe at a minimum, this court should remand the case back to the district court for a finding that says the royalty here was excessive. It should not have exceeded 4%. And based upon the record before this trial, Judge, it should be $140,000 on 137 and $2.2 million on 719. Thank you, Your Honor. Thank you. We'll restore your two minutes of rebuttal. And we'll hear from Mr. Pico. I'd first like to reply on Mars' appeal very briefly to say that the issue was raised during Mr. Mallon's argument of whether the assignment of title separately from the right to sue for past infringement in connection with an unexpired patent might create a conflict. And I believe that there are numerous precedents of this court that if you assign the title of a patent without the right to sue for past infringement, you don't get the right to sue for past infringement. You have a case that says that? This is the first time that arose here, Your Honor. If you'd like, I'll send a letter and identify the cases. But I think that those cases are fairly well known. I would like to turn for a minute or two to talk about the COINCO appeal. And I think what we need to all understand here is, first of all, COINCO was asked on day one to please stop infringing. That's what Mars wanted. And they didn't. They continued throughout this case. They did not adopt alternatives until after one of Mars' other patents expire. Now, that's the 565 patent. It hasn't been proved up that that was the reason, because COINCO wouldn't say what its reason for waiting all those years before it made a change in the 9300 from the old type to the new type. But it was after that patent expired, which had been enforced against others. Judge Lifland did an exceptionally careful consideration of all the factors. Mr. Mallon has been saying, well, this expert didn't know this or didn't know that. The point is, Judge Lifland did know. He had all these arguments. It was well presented before him. And then he called us all in. And he dictated his lengthy decision. As far as the alternatives are concerned, I think he took a very measured view. In the connection with the reasonable royalty, he said that he thought the parties would have taken into account COINCO's capability, his hypothetical capability at that time, way back when, and that that would have been a factor. But he was not acknowledging that they had the capability of those alternatives at that time. And indeed, they were never disclosed and never employed by COINCO until much, much later. So that's all there in the record. We've pointed to it in our memorandum. But because the alternatives have been mentioned so much today, I did want to call that fact to your attention. Mr. Mallon made the point that on the Schreiber issue, that applying Schreiber to the facts of this case doesn't necessarily cure because they never had the opportunity to assert defenses against MEI. Well, I was incredulous when I heard that. And I've heard it a few times before because they've never identified what could MEI have been asserting against them that wasn't asserted against them, that was decided against them. They infringed these patents. What more is there? Is it going to change what they did in terms? The question is who has the right to sue for the infringement when? For what? Well, that, of course, is true. But in terms of having a different- That's what gives rise to what he said that made you incredulous. What made me incredulous was to say that there might be some different defense. None have been identified. What different defense would you have against the patent? It's their acts that were the acts that infringed this patent. And they don't change regardless. They were competing with MEI all along. He said statute of limitations. And he said what kind of substitutes were available in the marketplace during a different time period. Well, the substitutes didn't pop up, indeed, until afterwards. Until the time when the alternatives that came forward came forward at a later time. Well, things popping up a little late. I mean, the 2006 agreement pops up a little late. I think late popping up is par for the course in this case. Late popping like corn. In any event, I would like to also talk about the policy reasons that relate to Shriver. You're having Ray Shriver, your honor. And that goes back to DEVX and the concept of full compensation. It also goes to the policy that's in section 1653. That the policy of the courts generally has been to permit a cure. And the Shriver is in that broad line. I have no further comments to make at this time. If you have any further questions, I'd be pleased to try and answer. All right. Thank you very much. Thank you. Mel. Thank you, your honor. You won't be penalized if you're brief. I will try to be, judge. With respect to the propriety, the reasonableness of the 7% royalty, I simply returned to that agreement that was. Extra time now is on your cross appeal, isn't it? Oh, that's true. I'm sorry, your honor. On the cross appeal with respect to the question of the lost profits. And specifically the Shriver analysis. There's another reason why the Shriver wouldn't apply at this point. Which is the question we raised earlier, which is one of title. In this particular case, since Mars did not receive or get a return of the title, Shriver wouldn't apply. This is your car in the junkyard issue. Maybe valueless, but nonetheless, there's a title to it. Exactly. And if you look carefully at Shriver, Shriver had a situation in which both the title and the right to sue was returned. Which is different than what happened in this particular case. Thank you, your honor. Thank both counsel. The case is submitted. Final argument.